**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**                                   Case No. 17-40100-CM

**OMAR CRUZ-ZAMORA,**

    **Defendant.**

## MEMORANDUM AND ORDER

Defendant Omar Cruz-Zamora was indicted on October 18, 2017 and charged with two counts of Possession with Intent to Distribute a Controlled Substance. On March 30, 2018, defendant filed a Motion to Suppress (Doc. 18) seeking suppression of the seized substances. The court held a hearing on the motion on May 9, 2018. After considering the briefing and the evidence and arguments presented at the hearing, the court is now ready to rule on the motion.

**I.  Background**

    a.  The Search

On September 21, 2017 at approximately 3:00 am, Kansas Highway Patrol Trooper Ryan Wolting was driving on I-70 in Lincoln County, Kansas. He noticed a red Hyundai Elantra with a suspended registration and initiated a traffic stop. As Wolting approached the vehicle, defendant, who was the sole occupant, asked him if he spoke Spanish. Wolting, recognizing defendant spoke very limited English, responded he did not. Wolting was able to communicate with defendant enough to understand that defendant had left his Mexican driver's license at home. Defendant, however, produced the car's registration and a visa entitling him to be present in the United States. He also informed Wolting he was traveling from Denver to Kansas City.

Wolting asked defendant in English if he would come back to his patrol vehicle. Defendant complied and was patted down before getting into the patrol car. Once in the patrol car, Wolting used a fingerprint scanner to try to identify defendant as he did not produce a driver's license. Unable to positively identify him, Wolting began using Google Translate, a translation service offered by Google, on his in-car laptop to communicate with defendant. Wolting would type a question in English into the service, selected "Spanish" as the language he wanted for the translation, and then clicked "OK." The service then translated the English phrase into Spanish. Wolting testified that because he did not speak Spanish, he could not verify the accuracy of the translation, but felt that defendant's answers were "appropriate" or within the scope of the question being asked. He did acknowledge there were a few times that defendant did not understand the question and that he had to rephrase the question to get an answer. Wolting testified that there was no department policy against using Google Translate, but admitted a live translator would be more reliable. He, however, did not know that a live translator was available for his use.

Using Google Translate, Wolting was able to learn that defendant was from El Paso, Texas, was traveling to Kansas City to see his uncle, and that the car belonged to defendant's girlfriend. Wolting issued defendant a warning for the suspended registration and then told defendant "Adios." As defendant got out of the patrol car, Wolting asked him in English whether he could ask him a couple more questions. Defendant responded "What?" and returned to the patrol car. Trooper Wolting testified he thought he used Google Translate to ask defendant if he could ask him more questions. Defendant agreed and Wolting began asking more questions using Google Translate. Defendant eventually revealed he had $7,700 in cash in his car that he was using to buy a car to take back to Mexico. At this point, Wolting, again using Google Translate, asked defendant if he could search his car. Wolting testified that he typed in either "Can I search the car" or "Can I search your car" and used his two fingers to point to his eyes

and then to the car.  Wolting testified that defendant responded "yeah, yeah go," and told him not to steal his money.  Wolting directed defendant to stand near the edge of the road while he searched the car.  He testified defendant never protested the search or asked him to stop searching the vehicle.  Wolting eventually found approximately 14 pounds total of methamphetamine and cocaine.

Defendant testified at the hearing that he had trouble understanding the questions asked by Wolting and did not understand that Wolting was asking his permission to search his car.  He also claimed he was confused and did not believe he could tell Wolting to stop searching the car.

    b.  Google Translate

At issue in this case is the use of Google Translate, a Google product used for translation.  As mentioned above, Wolting used Google Translate to translate his questions for defendant from English into Spanish.  Wolting would type the question into Google Translate and defendant would read the translation off the screen, sometimes out loud, and then answer the question in Spanish or sometimes in limited English.  This interaction was captured by Wolting's in-car camera.  With the help of an interpreter, the audio from the stop was transcribed and relevant parts were translated from Spanish into English.  While defendant's audible answers were captured in the transcript, there is no documentation of what questions Wolting typed into Google Translate, and what Google Translate translated for defendant to read.

Two professional interpreters testified at the hearing; one who translated the audio from the car stop and prepared the transcript and one who provided expertise on the reliability of Google Translate. Johana Garcia, who did the translation for the transcript, testified that she may use Google Translate as a tool but never to translate a full conversation.  She said Google Translate can be used for literal translations but not for slang or distinct dialects and that a live translator is a more reliable way for two people to communicate.

Sara Gardner, a professional interpreter who reviewed the audio and video from the car stop, testified that in her opinion defendant did not understand the questions asked by Wolting because Google Translate is not a reliable translation service. Gardner noted that Google Translate uses feedback from users to help improve its translations and there is no way of knowing whether the translations are accurate. She also testified that context is very important when performing interpretations, and that Google Translate offers only a literal translation and cannot take context into account. For example, Wolting testified that he asked defendant "Can I search the car?" When put into Google Translate, "Can I search the car" translates to "¿Puedo buscar el auto?" When put in reverse order into Google Translate, "¿Puedo buscar el auto?" translates to "Can I find the car." Gardner testified that while "¿Puedo buscar el auto?" is a literally correct interpretation, it is not the question Wolting intended to ask defendant. Gardner noticed several other instances in the video where Google Translate provided a literal but nonsensical translation. For example, at one point, Wolting likely asked defendant about his driver's license and defendant responded "Do you have a driver for the license?" as if he was repeating the question as translated. And while defendant could guess the intent of the question, Gardner felt that because Google Translate sometimes provides literal but nonsensical translations, it is not a reliable tool for interpretations.

Both interpreters noted there were multiple times defendant responded that he did not understand Wolting's questions. According to Gardner, defendant claimed he did not understand the question on nine different occasions during the stop. And in regard to the specific question as to whether Wolting could search defendant's car, Garcia testified that "¿Puedo buscar el auto?" is not exactly how a Spanish speaker would ask to "search in your car." Defendant, as a native Spanish speaker with very limited English skills, would instead have to make an assumption about what the question actually is.

**II.     Analysis**

-4-

a. Consent

Defendant moves to suppress the fruits of Wolting's search, arguing his Fourth Amendment rights were violated.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches are per se unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception to the warrant and probable cause requirements is "a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). And while a "search authorized by consent is wholly valid," the government has the burden of proving the consent was "freely and voluntarily given." *Id.* at 222. Courts must consider the totality of the circumstances when deciding whether consent was voluntary. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991) (citing *Schneckloth*, 412 U.S. at 227, 232–33, 249). According to the Tenth Circuit, courts must determine—considering the totality of the circumstances—whether (1) "consent was unequivocal and specific and freely and intelligently given," and (2) the officers used no "implied or express duress or coercion." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010). Further, mere submission to lawful authority does not equate to valid consent. *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993).

Language barriers are relevant when determining whether consent was freely given. *United States v. Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995). In a situation where a defendant is not fluent in the same language as the officer, the court can infer from the circumstances whether the defendant understood the officer's questions. *Id.* For example, in *Hernandez*, the defendant responded appropriately to all of the officer's requests, was able to tell the officer what he did for a living and where he was travelling, and responded "yes" when the officer asked him, in English, whether he could search

his vehicle. *Id*. The officer also had defendant read a request to search which was written in Spanish, and the defendant also responded affirmatively. *Id.* The court found that the evidence demonstrated the defendant understood the officer's requests and voluntarily consented to the search. *Id.*

Similarly, in *United States v. Zhang*, No. 04-40084-01-JAR, 2005 WL 627978 (D. Kan. March 10, 2005), a defendant moved to suppress evidence seized from her vehicle, arguing her consent was not voluntary because, as a native Mandarin Chinese speaker, she did not understand the officer's questions. And while an expert testified that the defendant could not understand simple questions in English because of her limited English skills, the court put more weight on the defendant's conduct in response to the officer's questions, noting "[a]lthough [the defendant] does not speak English well, she apparently understands more English than she speaks." *Id*. at *4–5. The court emphasized that the defendant's responses indicated she understood the officer's English questions and that in one of her recorded phone conversations while in jail, the defendant described the traffic stop saying it was a mistake to open the trunk when the officer asked if he could look in it. *Id.* at *5. Also on the call, defendant stated, "[o]n that day, the police…the police stopped and wanted to look into the back [of the car]," and that she gave the officer permission to look. *Id.* This invalidated her argument that she did not understand that the officer was asking her for her consent; rather, he was commanding her to open the trunk.

Here, defendant argues any evidence obtained as a result of the car search should be suppressed because he did not understand Wolting and therefore could not knowingly consent to the search.[1] Defendant focuses his argument primarily on Wolting's use of Google Translate, claiming that based on the audio and video of the encounter, it was obvious he was struggling to understand many of the

---

[1] In his briefing, defendant also argues the evidence should be suppressed because he did not consent to further questioning after the initial stop was complete. At the hearing, defense counsel conceded Wolting had probable cause to arrest defendant, as he stopped defendant for an arrestable offense, and therefore he did not need defendant's consent to extend the stop. While defense counsel did argue that Wolting would have been required to read defendant his *Miranda* warnings, counsel largely abandoned this argument to instead focus on whether the consent was knowing and voluntary.

translations. Importantly, defendant notes that the Google Translate translation of "Can I search your car?"—which Wolting testified is the question he asked defendant through Google Translate—was confusing and that he had trouble understanding exactly what Wolting was asking him.

Upon review of the evidence, it is clear that defendant had some basic understanding of some of Wolting's questions and commands. And defendant was able to answer some of Wolting's questions in basic, broken English. Wolting testified that when he typed in "Can I search the car?" defendant responded "yeah, yeah go." In the transcript from the video, there is point in which defendant says "Ah, okay. Yeah…yeah. Go. Yes." However, there is no evidence of what question defendant was responding to, as there is no documentation of what questions Wolting was typing into Google Translate. Immediately prior to his "Yeah…Yeah. Go. Yes," response, defendant was struggling to understand Wolting's questions:

>Officer: [Background Sound: Typing on Keyboard] [2]
>
>Defendant: Okay…*it is in front of the car because I'm going to look for it … How?*[3]
>
>Officer: *Do you understand?*
>
>Defendant: *No, how?*
>
>Officer: [Background Sound: Typing on Keyboard]
>
>Defendant: Ah, okay. Yeah…yeah. Go. *Yes.*

Assuming this is the point where Wolting claims defendant consented to the search, the court is hesitant to find defendant unequivocally consented, as defendant was clearly confused as to what Wolting was asking. And this is not the only instance where defendant expressed confusion about Wolting's questions. There are many times throughout the transcript where defendant says, "I don't understand"

---

[2] In the excerpts from the transcript from the car stop, anything in italics was spoken in Spanish and translated by Johana Garcia into English.

[3] Sara Gardner testified that here defendant said "Como?" which Johana Garcia translated as "How?" Gardner testified that "Como?" can also be interpreted as "What?" or "What do you mean?"

or seems confused as to the question that was interpreted through Google Translate. And, it is unclear, based on the Google Translate translation of "Can I search the car," that defendant fully understood the question Wolting intended to ask. As mentioned above, the professional interpreters both testified that while "¿Puedo buscar el auto?" is a literal translation of "Can I search the car," defendant, who had limited English skills, would not necessarily have been able to interpret that question as it was intended. As mentioned above, Google Translate translated "¿Puedo buscar el auto?" to "Can I find the car." It is impossible to know how defendant translated "¿Puedo buscar el auto?" and whether he was affirmatively consenting to a search of his vehicle or responding to a perceived command. And while he did exit the patrol car and stand by the side of the road without objection while Wolting performed the search, defendant testified that he did not understand the question, and did not know he had a choice when Wolting told him to stand near the side of the road.

Unlike other cases where the defendants' actions implied that they understood the officers' questions, here it is not so clear. Yes, defendant did demonstrate some basic understanding of Wolting's English questions and commands; however, when reviewing the transcript and considering the imprecise translation, the court does not find the government has met its burden to show defendant's consent was "unequivocal and specific and freely and intelligently given."

    b. Good-Faith Exception

The government argues that even if the court finds defendant's consent was not voluntary, the court should not suppress the evidence because Wolting reasonably relied on Google Translate to provide an accurate translation and then acted upon a reasonable belief that defendant granted him consent to search his car.

The ultimate touchstone in a Fourth Amendment inquiry is reasonableness. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006). Under the Fourth Amendment, so long as a factual determination

is reasonable, it doesn't always have to be correct. *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) (finding no Fourth Amendment violation so long as an officer reasonably (though erroneously) believes he has attained valid consent to search). Determination of whether an officer may legally conduct a search "must be judged against an objective standard . . ." *Id.* at 188. While officers are allowed room for factual mistakes, those mistakes "must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Id.* at 186 (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The remedy for unreasonable searches and seizures is the exclusionary rule, which allows courts to exclude the unlawfully seized evidence in a criminal prosecution. *United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006). The exclusionary rule is "harsh" and should only be invoked "when doing so furthers the purpose of that rule, which is 'designed to deter police misconduct.'" *Id.* at 1248–49. Therefore, courts utilize the good-faith exception to the exclusionary rule, which is applied when officers act with "objective good faith." *Id.* at 1249. The good-faith exception is narrow and is used "ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer." *Id.* The Tenth Circuit has not extended the good-faith exception to apply in cases where the officer's own factual mistake led to the Fourth Amendment violation. *Id*. at 1249, 1251 ("[The good-faith exception] has not been applied when the mistake resulting in the Fourth Amendment violation is that of the officer conducting the search and seizure, rather than a neutral third party not engaged in the 'competitive endeavor of ferreting out crime.'" (citing *United States v. Leon*, 468 U.S. 897, 914 (1984))). And the Tenth Circuit had declined to apply the good-faith exception when application of the exclusionary rule would effectively deter illegal police conduct that led to the Fourth Amendment violation. *Id.* at 1253.

The government argues the good-faith exception should apply in this case because even if defendant did not knowingly consent because he did not understand the question, it was reasonable for Wolting to rely on Google Translate's translations. Defendant claims that the good-faith exception should not apply because Wolting cannot reasonably rely on a mistake of his own making. The government argues that Wolting did not create the mistake. Rather, he used a Google product to produce translations and reasonably relied on Google's translations. And, according to the government, a non-Spanish speaker would never be able to tell if an interpretation was accurate regardless of whether it was from Google Translate or a live interpreter.

The government cites a recent case from the Southern District of Texas in which an officer used Google Translate to look up how to ask for consent to search in Spanish and then asked the defendant "Puedo buscar?" while pointing to his eyes and then to defendant's vehicle. *United States v. Salas Antuna*, No. 6:16–86, 2017 WL 2255565 at *1 (S.D. Tex, May 23, 2017). In denying defendant's motion to suppress—in which defendant argued his consent was invalid because of the language barrier—the court acknowledged that "Puedo buscar" is not a legally precise translation for "May I search," but that the officer reasonably relied on the Google Translate translation and that the good-faith exception applied. *Id*. at *5.

While the facts of *Salas Antuna* seem nearly identical to the present case, it is important to note that the officer first asked defendant in English if he could search or look, and pointed to his eyes and the trunk of the car. *Id.* at *1. In response, the defendant opened the trunk, indicating he could understand the officer's question in English. *Id.* Here, there is no indication Wolting asked to search the car in English, and defendant made no affirmative acts to indicate he fully understood his question. And even though the court in *Salas Antuna* found it was reasonable for the officer to rely on Google Translate, the court did not elaborate on the intricacies of the Google Translate service. Here, both

-10-

professional interpreters testified Google Translate should only be used for literal word-for-word translations as Google Translate cannot take context into consideration. So, while it might be reasonable for an officer to use Google Translate to gather basic information such as the defendant's name or where the defendant was travelling, the court does not believe it is reasonable to rely on the service to obtain consent to an otherwise illegal search. And here, Wolting admitted a live interpreter would be a more reliable source for communicating with a non-English speaker and acknowledged he had other options beyond using Google Translate.

For these reasons the court finds that the good-faith exception does not apply as it is not reasonable for an officer to use and rely on Google Translate to obtain consent to a warrantless search, especially when an officer has other options for more reliable translations. The government has not met its burden to show defendant's consent was "unequivocal and specific and freely and intelligently given," because defendant claims he did not understand the question, the transcript from Wolting's in-car camera supports defendant's claim that he did not understand many of his questions, and the Google Translate translation allegedly used by Wolting was not a precise translation of "Can I search the car?" Even though defendant answered "Ah, okay. Yeah…yeah. Go. *Yes*," it is not clear from the evidence what question was asked and what defendant was agreeing to, and the court will not interpret defendant's compliance with Wolting's instructions to stand by the side of the road during the search as implied consent, considering the totality of the circumstances. The court finds that application of the exclusionary rule is appropriate in this case, and therefore grants defendant's motion to suppress.

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress (Doc. 18) is granted.

Dated June 4, 2018, at Kansas City, Kansas.

                                                      s/ Carlos Murguia
                                                      **CARLOS MURGUIA**

**United States District Judge**